# IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

**REYNALDO & EVA SUAZO**
1119 Viers Mills Road
Rockville, MD 20851
    AND
**CATHERINE MARTINSON**
127 West Main Street
Westminster, MD 21157
    AND
**RONALD LEWIS**
8133 Grayden Lane
Brandywine, MD 20613
    *On Behalf of Three Classes of*
    *Similarly Situated Persons*
        **Plaintiffs**

Case No:

v.

**SELECT PORTFOLIO SERVICING, INC.**
SERVE ON:
CSC-Lawyers Incorporating Service
Company
7 St. Paul Street, SuiteSuite 820
Baltimore, MD 21202
    AND
**U.S. BANK TRUST, NA SOLELY IN ITS CAPACITY AS TRUSTEE FOR LSF9 MASTER PARTICIPATION TRUST**
SERVE ON:
The Corporation Trust Incorporated, Resident
Agent
351 W. Camden Street
Baltimore, MD 21201
    AND
**CALIBER HOME LOANS, INC.**
SERVE ON:
The Corporation Trust Incorporated, Resident
Agent
351 W. Camden Street
Baltimore, MD 21201
        **Defendants**

## CLASS ACTION COMPLAINT
## &
## REQUEST FOR JURY TRIAL

1

Plaintiffs Reynaldo and Eva Suazo ("Mr. & Mrs. Suazo"), Ronald Lewis ("Mr. Lewis"), and Catherine Martinson ("Ms. Martinson")(collectively "Named Plaintiffs" or "Plaintiffs"), on their individual behalf and on behalf of two classes of similarly situated persons, through their attorneys Phillip R. Robinson and the Consumer Law Center LLC, hereby brings this Class Action Complaint and Jury Demand against Defendants Caliber Home Loans ("Caliber"), Select Portfolio Servicing, Inc. ("SPS"), and U.S. Bank Trust, NA solely in its capacity as Trustee for LSF9 Master Participation Trust ("LSF9")(collectively "Defendants") and in support thereof state:

## I. INTRODUCTION

1.     The claims outlined herein exemplify certain predatory and deceptive and debt collection practices which have garnered headlines and damaged the economy for the past several years in which certain so-called professionals flout the law and which have embroiled Named Plaintiffs, and the putative Classes—the Caliber Class,[1] the SPS Class,[2] and a Inspection Fee Class[3]—they seek to represent. As a direct and proximate result of LSF9's illegal activity, the Defendants have been enriched by receiving profits from the Named Plaintiffs and putative class members they were not legally entitled to collect (i) while LSF9 was acting without the required collection agency license and (ii) directly or indirectly from the capitalization of property inspection fees into Caliber's and LSF9's standard modification/forbearance agreements.

2.     Specifically, Caliber and SPS have knowingly collected or attempted to collect from Named Plaintiffs, and the putative SPS and Caliber Classes of similar persons they seek to represent on behalf of LSF9, an unlicensed, collection agency, throughout the State of Maryland

---

[1]     The Caliber Class is defined in ¶ 118 *infra*.

[2]     The SPS Class is defined in ¶ 117 *infra*.

[3]     The Inspection Fee Class is defined in ¶ 119 *infra*.

who may not collect or attempt to collect consumer debts while not licensed. Caliber, SPS and LSF9 know the law and since 2007 the law has been clear that in order for a collection agency to collect or attempt to collect in the State of Maryland either directly or indirectly it must be licensed pursuant to Bus. REG. § 7-301.

3.     The Defendants also know that longstanding Maryland law holds that unlicensed professionals may not profit from their illegal activities and in the case of mortgages, may only collect the principal portion claimed due from borrowers. Fin. Inst. § 11-523(b). *Compare Harry Berenter, Inc. v. Berman*, 258 Md. 290, 293 (1970); *McDaniel v. Baranowski*, 419 Md. 560, 587 (2011); *Thorpe v. Carte*, 252 Md. 523, 526 (1969); *Snodgrass v. Immler*, 232 Md. 416, 424 (1963); *Goldsmith v. Manufacturers' Liab. Ins. Co. of New Jersey*, 132 Md. 283 (1918).

4.     Further, a person who is required to be licensed as a collection agency may not shield its collection activities through persons like Caliber or SPS who are required to have a separate license; all efforts to argue such an exemption under Maryland law have been rejected including failed legislation in the 2018 session of the Maryland General Assembly.

5.     In addition, Caliber on behalf of LSF9 and with its specific authority, has capitalized into Caliber's and LSF9's standard modification/forbearance agreements property inspection fees it claimed were allegedly due from borrowers whose loans are owned by LSF9 even through Maryland law specifically provides that "a lender may not impose a lender's inspection fee in connection with a loan secured by residential real property." COM. LAW § 12-121(b). *See also Taylor v. Friedman*, 344 Md. 572, 584 (1997)("For the foregoing reasons we conclude that the legislative history does not so clearly demonstrate a purpose to limit the prohibition of § 12–121 to closing costs as to override the plain language of the statute"); LSF9 has thereafter collected those illegal fees that are capitalized into its standard modification/forbearance agreements. In this case

3

as the assignee of maker of the loans subject Ms. Martinson and the putative Inspection Fee Class members, LSF9 is now the lender and maker of the loans and Caliber is its authorized agent to act on its behalf.

6.     By unfairly and deceptively aiding and assisting an unlicensed collection agency and illegally collecting property inspection fees in the State of Maryland, as described herein, Caliber and SPS have further violated their duty of good faith and fair dealing pursuant to their own license by the State of Maryland (which it may not lend to any other person or entity) in connection with the servicing of mortgage loans. Md. Code Regs. 09.03.06.20. By acting as an unlicensed collection agency and collect property inspection fees through its standard modification/forbearance agreements, LSF9 has committed crimes under Maryland law. BUS. REG. § 7-401 provides that a person acting as an unlicensed collection agency "who violates this section is guilty of a misdemeanor, and on conviction, is subject to a fine not exceeding $1,000 or imprisonment not exceeding 6 months or both." *See also* COM. LAW § 12-122 (recognizing that knowingly and willfully demanding and seeking benefit from the collection of property inspection fees is a crime).

7.     Three circuit courts have held that LSF9 may not collect and do business in the State of Maryland since it is unlicensed as a collection agency but is required to be licensed. The court orders entering these final judgments are attached hereto as Exhibits 1-3. In addition, LSF9's appointed agents have stipulated in a prior action to it acquired the consumer debt at a discount. Exhibit 4.

8.     Under Maryland law the property inspection fees capitalized by Caliber and LSF9 into their standard modification/forbearance agreements and the putative class members' constitute

4

"interest" as that term is defined in COM. LAW § 12-101(e) and therefore also constitutes "usury" as that term is defined in COM. LAW § 12-101(k).

9.  The Office of the Commissioner of Financial Regulation ("OCFR"), as the agency specifically authorized to enforce and regulate Maryland's mortgage lending laws, is entitled to deference for its interpretation of those laws. *Comm'r of Fin. Regulation v. Brown, Brown, & Brown, P.C.*, 144 A.3d 666, 675 (2016). Over the course of the former and current administration, OCFR's analysis of the property inspection fee issue has not wavered and supports the position advanced by Named Plaintiffs in this action (i.e. that LSF9 as the successor assignee stands in the shoes of its assignor(s)) that neither Caliber or LSF9 may impose inspection fees pursuant to COM. LAW § 12-121) as evidence as follows:

      a.  OCFR issued an Industry Advisory on January 7, 2014 informing its licensees, including Seterus, that it was not permitted to impose inspection fees on mortgage borrowers. A true and correct copy of the notice is attached as Exhibit 5 to this Complaint and is also publicly available at https://www.dllr.state.md.us/finance/advisories/advisory-nonjudicialevictions.pdf.

      b.  On April 20, 2017 the OCFR issued a Summary Cease and Desist Order to Ocwen Loan Servicing LLC ("Ocwen") and its affiliates on various issues including Ocwen's unfair and deceptive practice, like the practices of Seterus subject to this action, which improperly assessed inspection fees against the accounts of borrowers in violation of COM. LAW § 12-121, including accounts of borrowers owned by GSE's including Fannie Mae. *See* Ocwen C&D Order at ¶¶ 79-83. Ocwen recently agreed, on February 23, 2018, to a resolution of the OCFR C&D Order and agreed to reimburse borrowers for the improper assessment and

collection of inspection fees by: (i) cash refunds for fees paid, (ii) crediting accounts

where the fee was assessed but not paid, and (iii) refunding interest incurred when

Ocwen capitalized the illegal inspection fees onto borrowers' accounts as part of a

modification that increased the unpaid principal balance. *See* Ocwen Settlement

Agreement         at         ¶         26         (available         at

https://www.dllr.state.md.us/finance/consumers/pdf/ocwencd.pdf).

10.    Caliber, SPS and LSF9 have proximately caused damages and losses to the class members

by assessing and collecting sums from Named Plaintiffs and the putative class members which are

not lawfully due. Also, Caliber, SPS, and LSF9 has been unjustly enriched and they should not be

permitted to retain the benefit of its illegal activities. Finally, the Usury Class members are also

entitled to statutory damages under Maryland law.    Named Plaintiffs are also putative class

members of another action, *Altenburg v. Caliber Home Loans, Inc.* that is pending in the United

States District Court for the District of Maryland (Case No. 16-3374—RDB). However, in this

action they do not seek the damages and relief that is sought in that action at this time. Pursuant

to *Artis v. D.C.*, 138 S. Ct. 594 (2018) and 28 U.S.C. § 1367(d), Named Plaintiffs' state law claims

presented in the *Altenburg* action are tolled while pending before the Federal Court.

## II. PARTIES

11.    Reynaldo and Eva Suazo are residents and citizens of the State of Maryland and are the

owners of the real property commonly referred to as 1119 Viers Mills Road, Rockville, MD 20851

("the Suazo Property") where they reside with their family.

12.    Catherine Martinson is a resident and citizen of the State of Maryland and is the owner of

the real property commonly referred to as 127 West Main Street, Westminster, MD 21157 ("the

Martinson Property") where she resides with her family.

13. Ronald Lewis is a resident and citizen of the State of Maryland and is an owner of the real property commonly referred to as 8133 Grayden Lane, Brandywine, MD 20613 ("the Lewis Property") where he resides with his family.

14. Defendant LSF9 is a Delaware Statutory Trust and no publically-held corporation owns 10% or more of LSF9. In addition:

   a. LSF9 is part of a large family of private equity funds acquired and owned by Lone Star Funds ("Lone Star"), a leading private equity firm, which has organized sixteen private equity funds (the "Funds") that are (i) structured as closed-end, private-equity limited partnerships and (ii) include limited partners such as corporate and public pension funds, sovereign wealth funds, university endowments, foundations, fund of funds and high net worth individuals.[4]

---

[4] *See* "About Lone Star Funds" description available at http://www.lonestarfunds.com/about-us/ (last visited May 4, 2016); "About Lone Star" description from Hudson Advisors LP available at http://www.hudson-advisors.com/about-lone-star/ (last visited May 4, 2015); "Lone Star Fund IX" description available at http://www.lonestarfunds.com/funds-raised/capital-growth/lone-star-fund-ix/ (last visited May 4, 2016). *See also* Hudson America L.P., Part 2A of Form ADV, the Brochure (dated Maryland 30, 2016) available at http://www.adviserinfo.sec.gov/ as part of Hudson's legally required filings as a Registered Advisor with the SEC (last visited May 3, 2016) at Page 3 (Hudson "and [its] affiliates "provide investment advisory and related services to a family of closed-end, privately-offered funds (the "Funds")…[including] Lone Star Fund IX"); Page 4 ("The Funds [including LSF9] invest in a broad range of financial and other investment assets, subject to the terms of each Fund's Offering Documents. These assets include, but are not limited to…single family residential real estate-secured debt…and consumer debt"); Pages 13-14 ("the Funds' [including LCF9] opportunistic investment strategy focuses on the expected returns of each potential investment on an individual basis"); Page 14 ("The Funds may make investments in secured and unsecured non-performing loans or other troubled assets that involve a significant degree of legal and financial risk and, particularly in the international context, political risks").

7

b. LSF9 is exclusively and entirely managed by Hudson Advisors L.P. which performs due diligence and analysis, asset management, and other support services for LSF9 and the assets acquired by LSF9 (including the Altenburg's putative and Wood's loans and the loan of the putative Class Members).[5] While U.S. Bank is named as the trustee for LSF9 it has no management responsibilities for LSF9 and does not govern its affairs whatsoever.

c. As a regular part of its business, LSF9 acquires defaulted debts,[6] just like the LSF9's debts subject to these proceedings, for less than the (i) value of the real

---

[5] Hudson America L.P., Part 2A of Form ADV, the Brochure (dated March 30, 2016) available at http://www.adviserinfo.sec.gov/ as part of Hudson's legally required filings as a Registered Advisor with the SEC (last visited May 3, 2016) at Page 3 (Hudson "and [its] affiliates "provide investment advisory and related services to a family of closed-end, privately-offered funds (the "Funds")…[including] Lone Star Fund IX"); Lone Star Americas Acquisitions, LLC, Part 2A of Form ADV, the Brochure (March 30, 2016) (available at available at http://www.adviserinfo.sec.gov/ as part of Hudson's legally required filings as a Registered Advisor with the SEC (last visited May 3, 2016) at Page 5 ("Lone Star and Hudson work closely together throughout the life of an investment, providing coordinated investment management services. In connection with the acquisition of an investment, Hudson typically develops an initial business plan for the ongoing management of the investment, consistent with the Investment Committee Memorandum (each, a "Business Plan"). After an investment has been closed and integrated into Hudson's asset management program, **Hudson performs ongoing day-to-day asset management of the investment consistent with the Business Plan**. Lone Star provides strategic and other related advice regarding investments held by the Funds")(emphasis added).

[6] New Mexico Educational Retirement Board Investment Committee Meeting Minutes for March 14, 2014 at Page 3("Lone Star is a private equity firm headed by John Grayken. They invest in distressed assets globally, mostly real estate oriented. Lone Star IX will focus on noncommercial real estate loans…These investments include distressed whole loans [and] nonperforming loans…") (available at https://www.nmerb.org/pdfs/icminutes032014.pdf) (last visited May 4, 2016).

estate secured by the debt and (ii) the sum loan balance.[7]  In other words, LSF9 is

a consumer debt purchaser who acquires defaulted consumer debts for pennies on

the dollar.

15.      Defendant Caliber is the debt collector for LSF9 which is or was the owner of Named

Plaintiffs' mortgage loans subject to this action.  Caliber has served in this capacity on behalf of

LSF9 since about July 10, 2014.  LSF9 has delegated and assigned all duties related to Named

Plaintiffs' loans (and the loans of the class members) to Caliber as its authorized agent on its behalf.

These duties include the retention of attorneys/substitute trustees and other collection agencies to

initiate foreclosures and assert proceedings against Maryland residents.    Caliber also acts as

LSF9's Attorney-in-Fact as part of LSF9's and Caliber's regular and routine collection practices.

---

[7] *See e.g.* "Fannie Mae Announces Winning Bids for its Second Sale of Non-Performing Loans," Fannie Mae Press Release dated August 20, 2015 (available at http://www.fanniemae.com/portal/about-us/media/financial-news/2015/6281.html)(last visited May 4, 2016) (announcing that LSF9's affiliate, Lone Star Mortgage Holdings, LLC, was the winning bidder for two pools of non-performing Fannie Mae loans offered by Fannie Mae for sale for nearly half of the claims unpaid balances for one pool and the "average delinquency of the loans was approximately 37 months with an average [Broker Price Opinion Loan to Value] of 76%");

Report to the Commissioner on FHA Single Family Loan Sales (Data as of February 6, 2015), U.S. Department of Housing and Urban Development, Federal Housing Development                              (available                              at http://portal.hud.gov/hudportal/documents/huddoc?id=sale.report.pdf)(last visited May 4, 2016) at Pages 1 & 8 (identifying Lone Star as the purchaser of the largest volume of loans purchased in "National sales" by the FHA of defaulted FHA mortgage loans have been typically offered from 40% to 60% of the unpaid principal balance of the loans). *See also* "Lone Star Wins $3.8 Billion of Bad FHA Loans at Auction," Bloomberg News (June 20, 2014)(available at http://www.bloomberg.com/news/articles/2014-06-20/lone-star-wins-3-8-billion-of-bad-fha-loans-at-auction)(last visited May 4, 2016); "Lone Star Collects Quick $5.7B So Far for Fund IX," The Wall Street Journal (April 11, 2014)(available at http://blogs.wsj.com/privateequity/2014/04/11/lone-star-collects-quick-5-7b-so-far-for-fund-ix/)(last visited May 4, 2016).

16.     Defendant SPS is also a debt collector for LSF9 in some instances related to LSF9's loan practices.    When Caliber and LSF9 modify a borrowers' into LSF9's standard modification/forbearance agreements, LSF9 transfers the servicing rights from its loans from Caliber to SPS.  SPS thereafter continues to collect upon the loan on behalf of LSF9 until LSF9 pools together a group of "reperforming loans" and sells those loan to others for additional profits. While SPS is acting on LSF9's behalf, LSF9 has delegated and assigned all duties related to the relevant loans (and the loans of the class members) to SPS as its authorized agent on its behalf. These duties include the continued collection of fees, interest, and other profits from certain of the Named Plaintiffs and putative class members until the loans are sold to another.

17.     Not named as Defendants in this action, the law firm of the BWW Law Group, LLC  and its attorneys/substitute trustees, including Carrie Ward, Howard Bierman, Jacob Geesing, Pratima Lele, Joshua Coleman, Richard Goldsmith, Jr., Ludeen McCartney-Green, Jason Kutcher, Elizabeth Jones, Nicholas Derdock, Andrew Brenner, and Angela Dawkins (collectively "BWW"), were retained by LSF9 and Caliber to collect from Ms. Martinson in litigation in the Circuit Court for Carroll County, Maryland.

### III. JURISDICTION & VENUE

18.     Declaratory and injunctive relief are available pursuant to CTS. & JUD. PROD. §§ 3-401 – 3-415, and RULE 2-231 (b)(2).

19.     Venue in this Court is proper in that the Defendants transact business within Montgomery County in relation to Montgomery County residents as part of their debt collection/mortgage servicing practices and includes conduct complained of occurred in Montgomery County, Maryland.

20.     This Court has equitable jurisdiction over the claims asserted herein. 9 M.L.E. Equity § 2.

21.     This Court has jurisdiction of this matter pursuant to Rule 2-231 in order to facilitate management of multiple similar claims. Maryland law does not permit class actions to be maintained in the District Court of Maryland.

22.     This Court has jurisdiction asserted because the Defendants transact business, perform work, have interests in real property, and provides services in Maryland.

## IV. FACTS

### A.     ADDITIONAL BACKGROUND ON THE DEFENDANTS

23.     This case involves a new industry which has entered the field of consumer debt collection since the financial crisis which began. Specifically, this industry of Wall Street related hedge funds have acquired hundreds and thousands of defaulted, consumer loans, which are non-performing and otherwise in default, for pennies on the dollar of what is claimed due and owing from consumers. Multiple public interest and media organizations have reported irregularities related to this industry including the following:

        a. The New York Times has reported, "Lone Star Funds, a $60 billion private equity firm founded in 1995 by John Grayken. In just a few years, Lone Star's mortgage servicing firm, Caliber Home Loans, has grown from a bit player to a major force in the market for distressed mortgages. An examination by The New York Times of housing data and court filings, as well as interviews with borrowers, lawyers and housing advocates, revealed a pattern of complaints that Lone Star was quick to begin foreclosure proceedings, whether the firm had bought a delinquent mortgage at a federal auction or directly from a bank." *As Banks Retreat, Private Equity Rushes to Buy Troubled Home Mortgages* (9/28/2015)(available at http://www.nytimes.com/2015/09/29/business/dealbook/as-banks-retreat-private-

11

equity-rushes-to-buy-troubled-home-mortgages.html)(last visited October 2, 2016).

b. The National Consumer Law Center reports "Caliber, a servicer acting for one of the largest purchasers at DASP sales, offers five year 'interest only' payment plans. These plans lull borrowers with a teaser payment that will eventually convert to a level at least as high as the previously unaffordable payment and include a huge balloon payment due for all earlier unpaid amounts. Calling these types of offers 'modifications' of the mortgage is deceptive." *OPPORTUNITY DENIED How HUD's Note Sale Program Deprives Homeowners of the Basic Benefits of Their Government-Insured Loans,* National Consumer Law Center (May 2016) at Page 34 (available online at https://www.nclc.org/images/pdf/pr-reports/opportunity-denied-report.pdf)(last visited October 2, 2016).

c. The Center for Popular Democracy reports that "The approach to modifications taken by Caliber Home Loans, a subsidiary of Lone Star Funds, does not appear to prioritize sustainable relief to struggling homeowners. Nor does it seem that Caliber passes on enough of the benefits of buying these loans at a discount to homeowners or communities. In multiple cases, Caliber has offered principal forbearance instead of principal reduction, despite the fact that Caliber bought the loans for less than the unpaid principal balance. Principal forbearance creates a balloon payment that has to be paid if the home is sold, the loan refinanced, or when the loan matures, which can make it difficult for homeowners to refinance or sell if they need to. Additionally, Caliber often offers temporary loan modification terms with 'five-year interest-only;' these terms meant that homeowners are not paying

12

down principal at all and will owe as much after five years of payments as they did when they began the process" (footnote omitted). *Do Hedge Funds Make Good Neighbors? How Fannie Mae, Freddie Mac & HUD are Selling Off Our Neighborhoods to Wall Street,* Center for Popular Democracy (June 2015)(available at https://populardemocracy.org/sites/default/files/Housing-report_web-final.pdf)(last visited October 2, 2016).

24.     Caliber and LSF9 are also subject to multiple public complaints by consumers and regulators which demonstrate Caliber and LSF9 have knowledge of certain of the issues raised in this matter related to its pattern and practices. Examples of these include:

   a.   The New York Department of Financial Services is investigating Caliber's and LSF9's handling of distressed mortgages. *See Caliber Said to Be Asked for Data on Handling Distressed Mortgages,* New York Times (published 9/24/2016)(available                                                          at http://www.nytimes.com/2016/09/24/business/dealbook/caliber-said-to-be-asked-for-data-on-handling-distressed-mortgages.html?_r=0) (last visited October 2, 2016).

   b.   As of April 7, 2018, the Consumer Financial Protection Bureau's complaint database included approximately 2,846 consumer complaints involving Caliber's mortgage servicing practices including those practices on behalf of LSF9. Included in these complaints are more than 105 from Maryland residents in the last three years.        These        complaints        are        publically        available        at https://data.consumerfinance.gov/dataset/Consumer-Complaints/s6ew-h6mp.

25.     The Court of Special Appeals recognized in a reported decision held that entitles like LSF9 may not collect or attempt to collect in the State of Maryland without a collection agency license. *Blackstone v. Sharma*, 233 Md. App. 58, 73–74, cert. granted, 456 Md. 53 (2017).   In the consolidated oral arguments before the Court of Appeals on November 30, 2017, Caliber and LSF9 admitted to the Court of Appeals that requiring LSF9 to become licensed as a collection agency was problematic because LSF9 would be required to pay taxes that it now claims (incorrectly) that it is not required to pay.   SPS knows about the holding in *Blackstone* but has disregarded it and continued to collect on behalf of LSF9.

## B.     FACTS ABOUT NAMED PLAINTIFFS MS. & MRS. SUAZO

26.     On or about January 13, 2006 Mr. & Mrs. Suazo refinanced the Suazo Property, their home and property, with Bank of America, NA ("Suazo Loan").   They refinanced the loan for personal, consumer purposes changing their then existing loan terms.   The proceeds of this refinance were used entirely for these personal, consumer purposes.

27.     Due to a reduction of household income, Mr. & Mrs. Suazo were not able to continue to make payments on the Suazo Loan were not made and the Suazo Loan became in default.   The then servicer of their mortgage loan, Bank of America, NA ("BANA") confirmed this fact to Mr. & Mrs. Suazo in correspondence dated December 12, 2013 and June 28, 2014.

28.     The mortgage servicing of the Suazo Loan was service transferred from BANA to Caliber on or about November 14, 2014.   At that time Caliber acquired and boarded over from BANA the loan records related to the Suazo Loan which confirmed that the loan was in default at that time.

29.     On May 22, 2015 LSF9 acquired by assignment and transfer all of BANA's "right, title, interest in and to said Mortgage in the amount of $299,000.00."   This transfer was memorized in

an Assignment of Mortgage/Deed of Trust (Book 50355/Page 193) in an instrument recorded in the land records of Montgomery County, Maryland. LSF9 acquired ownership of the Suazo Loan

30.     At that time LSF9 acquired the ownership rights of the Suazo Loan it believed the loan was in default. LSF9's belief was based on BANA's and Caliber's records related to the loan. LSF9 acquired the Suazo Loan for a sum less the sum then claimed due on the Suazo Loan.

31.     At no time did any person directly affiliated with LSF9 or acting on its behalf ever disclose to Mr. & Mrs. Suazo that it was not licensed as a Maryland collection agency and therefore was acting illegally.

32.     The sums claimed due by Caliber on behalf of LSF9 included sums claimed due for interest, fees, and costs which amount to profits claimed by LSF9 on the Suazo Loan but LSF9 was not entitled to collect these as an unlicensed collection agency (see ¶ 3 supra).

33.     Because Caliber and LSF9 concealed from Mr. & Mrs. Suazo that LSF9 was not licensed as a collection agency and as an unlicensed, so-called professional, LSF9 had no legal right to demand any sums, directly or indirectly; nor was LSF9 entitled to profit from its illegal activities either directly or indirectly (see ¶ 3 supra).

34.     Mr. & Mrs. Suazo did not know until a period of less than one year before the commencement of this action that LSF9 was acting illegally under Maryland and Federal law.

35.     While Caliber was servicing the Suazo loan, and during the period of time less than three years before the commencement of this action, Caliber collected on behalf of LSF9 from Mr. & Mrs. Suazo sums claimed due for interest, fees, and costs which amount to profits claimed by LSF9 but LSF9 was not entitled to collect these as an unlicensed collection agency (see ¶ 3 supra).

36.     While Caliber was servicing the Suazo Loan, Caliber also on behalf of LSF9 agreed to modify the Suazo loan into LSF9's standard modification/forbearance agreement which

15

capitalized sums claimed due by Caliber on behalf of LSF9 including alleged interest, fees, and costs which amount to profits claimed by LSF9 but LSF9 was not entitled to collect these as an unlicensed collection agency (*see* ¶ 3 *supra*).

37.     After the Suazo Loan into LSF9's standard modification/forbearance agreement, Caliber continued to collect interest, fees, and costs from Mr. & Mrs. Suazo on behalf of LSF9 on a regular basis.

38.     Pursuant to its normal practice discussed *supra*, LSF9 also transferred the servicing rights to the Suazo Loan from Caliber to SPS once the loan was reperforming again. This servicing transfer occurred on or about May 1, 2015.

39.     After the servicing rights on the Suazo Loan transferred to SPS, SPS continued to demand and collect on behalf of LSF9 alleged interest, fees, and costs from Mr. & Mrs. Suazo which amount to profits claimed by LSF9 but LSF9 was not entitled to collect these as an unlicensed collection agency (*see* ¶ 3 *supra*).

40.     The interest, fees, and costs collected by Caliber and SPS on behalf of LSF9 from Mr. & Mrs. Suazo are liquidated sums that are known to the Defendants since they are required to track all sums collected from borrowers as part of the business practices.

41.     Because the terms and conditions of LSF9's standard modification/forbearance agreement are not favorable for borrowers for the long-term, Mr. & Mrs. Suazo sought to refinance Suazo Loan to more favorable terms and were subsequently approved for a refinance transaction with Homeside Financial LLC and they were approved for the new loan.

42.     On May 14, 2016, Mr. & Mrs. Suazo participated in a real estate settlement of the Suazo Loan. As part of that settlement, SPS on behalf of LSF9 faxed to Homeside Financial LLC on April 29, 2016 at 2:26PM a payoff statement itemizing what it claimed was then due to LSF9 to

16

pay off the Suazo Loan. That payoff statement demanded: (i) a sum for the then unpaid principal balance claimed due by LSF9 and SPS (which included interest, fees, and costs capitalized by LSF9's standard modification/forbearance agreement with Mr. & Mrs. Suazo); (ii) interest then claimed due from Mr. & Mrs. Suazo; (iii) outstanding late charges claimed due from Mr. & Mrs. Suazo; (iv) outstanding NSF charges claimed due from Mr. & Mrs. Suazo; and (v) recording fee from Mr. & Mrs. Suazo.

43. Because LSF9, Caliber, and SPS had concealed from them the fact that LSF9 was acting illegally as an unlicensed collection agency, Mr. & Mrs. Suazo proceeded to settlement on their new loan on May 14, 2016 and as a result of that settlement SPS and LSF9 were paid the sums by Mr. & Mrs. Suazo which SPS demanded in the April 29, 2016 payoff statement which failed to disclose that LSF9 was not permitted to profit from its illegal activities. Specifically, Mr. & Mrs. Suazo paid as part of the settlement the following liquidated sums which LSF9 and SPS were not permitted to charge:

> a. a portion of the then unpaid principal balance which included interest, fees, and costs capitalized by LSF9's standard modification/forbearance agreement with Mr. & Mrs. Suazo;
>
> b. interest then claimed due from Mr. & Mrs. Suazo;
>
> c. late charges claimed due from Mr. & Mrs. Suazo;
>
> d. outstanding NSF charges claimed due from Mr. & Mrs. Suazo; and
>
> e. recording fee from Mr. & Mrs. Suazo.

44. Mr. & Mrs. Suazo's damages and losses asserted herein accrued within three years of the commencement of this action and otherwise are tolled by the *Altenburg* action in the U.S. District Court of Maryland.

17

45.	Mr. & Mrs. Suazo are also entitled to restitution damages and losses from LSF9 since it is not permitted to profit off its illegal activities in Maryland. To suggest otherwise would permit LSF9 to retain profits from its illegal activity.

## C.	FACTS ABOUT NAMED PLAINTIFF CATHERINE MARTINSON

46.	On or about May 25, 2007 Ms. Martinson refinanced the Martinson Property, her home and property, with First United Home Loans ("Martinson Loan"). She refinanced the loan for personal, consumer purposes changing her then existing loan terms. The proceeds of this refinance were used entirely for these personal, consumer purposes. The Martinson Loan was thereafter transferred to the now defunct OneWest Bank, FSB via a FDIC sale of OneWest's assets to IndyMac Bank, F.S.B. Thereafter, the Martinson Loan was assigned to Ocwen Loan Servicing LLC ("Ocwen").

47.	Due to a reduction of household income, Ms. Martinson was not able to continue to make payments on the Martinson Loan and it became in default as of May 2, 2009.

48.	On August 3, 2016, LSF9 acquired ownership interest in the Martinson Loan and its associated Deed of Trust recorded in the land records for Carroll County, Maryland. In an Assignment of Mortgage/Deed of Trust recorded in the land records of Carroll County, Maryland (Book 8411, Page 92) LSF9 was assigned all of Ocwen's "right, title and interest in and to said Mortgage in the amount of $118,000.00."

49.	As the time of this assignment of the Martinson Loan to LSF9, Caliber was its authorized mortgage servicer. In addition, at this time both Caliber and LSF9 believed the Martinson Loan was in default. LSF9 acquired the Martinson Loan for a sum less the sum then claimed due on the Martinson Loan.

50.	At the time of the purchase and assignment of the Martinson Loan, Caliber and LSF9 accepted without question all representations and statements of its predecessors as to the fees,

18

costs, interest, and other sums claimed due on the Martinson Loan. Included in these the fees, costs, interest, and other sums claimed due from Ms. Martinson on the Martinson Loan by Caliber and LSF9 were property inspection fees billed to Ms. Martinson's loan account on multiple dates including: January 31, 2011, February 22, 2011, March 39, 2011, April 27, 2011, May 25, 2011, July 1, 2011, August 2, 2011, August 24, 2011, September 30, 2011, November 1, 2011, November 29, 2011, December 22, 2011, February 28, 2012, April 26, 2012, April 30, 2012, May 29, 2012, June 18, 2012, June 26, 2012, July 23, 2012, August 23, 2012, September 17, 2012, September 25, 2012, October 22, 2012, November 16, 2012, January 3, 2013, January 17, 2013, March 28, 2013, April 30, 2013, May 22, 2013, July 1, 2013, August 13, 2013, August 30, 2013, September 10, 2013, November 27, 2013, November 27, 2013, January 7, 2013, January 16, 2014, February 4, 2014, March 5, 2014, April 10, 2014, April 15, 2014, May 6, 2014, May 22, 2014, June 2, 2014, June 24, 2014, September 10, 2014, September 17, 2014, November 4, 2014, December 8, 2014, January 6, 2015, February 3, 2015, March 23, 2015, April 28, 2015, June 15, 2015, July 12, 2015, August, 20, 2015, October 1, 2015, October 26, 2015, and November 30, 2015.

51.    By its appointed agents and with the assistance of Caliber, LSF9 authorized BWW to commenced a foreclosure action Ms. Martinson as an attempt to collect from Ms. Martinson the sum it claimed due on the Martinson Loan (*Ward v. Martinson*, Case No. 06-C-16-072216 ("*Martinson Action*") (filed on October 7, 2016)) in the Circuit Court for Carroll County.

52.    In the *Martinson Action* LSF9 claimed under penalties of perjury by the sworn testimony by Caliber acting as its attorney in fact (which was dated September 21, 2016) that Ms. Martinson owed the following categories of sums Martinson Loan:

        a.   interest then claimed due from Ms. Martinson;

        b.   late charges claimed due from Ms. Martinson;

19

    c.  fees and costs; and

    d.  outstanding foreclosure fees and costs.

53.    Ms. Martinson voluntarily appeared in the *Ward v. Martinson* ("*Martinson Action*") and successfully defended against LSF9's action against her and the Martinson Property which LSF9 had no right to pursue, directly or indirectly, while LSF9 was unlicensed as a collection agency.

54.    Ms. Martinson incurred attorney fees to defend against LSF9's improper, deceptive, and unfair collection attempt through the *Martinson Action*.

55.    The Circuit Court for Carroll County dismissed the *Martinson Action* agreeing that LSF9 had no right to authorize its commencement by BWW. *See* Exhibit 3.

56.    Following dismissal of the *Martinson Action*, Caliber offered Ms. Martinson the opportunity to modify the Martinson Loan in correspondence dated May 5, 2017 but not transmitted to Ms. Martinson until after the *Martinson Action*. Specifically, LSF9's offer was as follows:

**Loan Modification Review**

Based on our review of your financial circumstances, you are approved for the following modification: Private 5 Year Interest Only Mod.

You were evaluated for mortgage payment assistance using the eligibility requirements of the investor/owner of your mortgage loan. These requirements for determining borrower eligibility for a loan modification include the use of a hierarchy evaluation approach. This is where borrowers are evaluated for programs in a specific order that is determined by the investor/owner of your loan. As a result, a borrower who is eligible for a modification program higher in the hierarchy order, is ineligible for a modification program lower in the hierarchy, to the extent applicable.

57.    Even though LSF9 and Caliber had acted illegally against her, Ms. Martinson accepted LSF9's and Caliber's offer on May 24, 2017 to help mitigate the overall situation. She he did not waive any rights or claims she had against LSF9, Caliber, or their agents by doing so.

58.    After making the trial payments required by LSF9's offer in paragraph §56 *supra*, Caliber on behalf of LSF9 provided Ms. Martinson with the terms and conditions of LSF9's LSF9's

standard modification/forbearance agreement dated August 7, 2017 as applied to the sums claimed

due by LSF9 and Caliber from Ms. Martinson:

**2. Modification of the Loan Documents**

If the conditions of this Agreement are satisfied, then your Loan is modified as follows:

Modification Period: The payments on your loan will be modified from the effective date of the modification, which will be September 1, 2017 (the "Modification Effective Date"). You will pay the initial modified amount from the Modification Effective date until September 1, 2022 ("Initial Modification Period"). At the end of the Initial Modification Period, and beginning at Year 6, your interest rate and corresponding monthly principal and interest payment will increase in accordance with the table below until Year 2024, when your interest rate will remain fixed for the balance of the term of your Loan.

Term Extension: The term of the Note has been extended and the new maturity date of the Loan will be September 1, 2057.

Modified Principal Balance: On the Modification Effective Date, the unpaid principal balance payable under the Note is $200,833.87 (the "Modified Unpaid Principal Balance"). This amount consists of $118,000.00 remaining due under the original terms of the Note, plus some or all other unpaid amounts that are capitalized into the modified Loan (the "Capitalized Amounts").

Borrower understands that by agreeing to add the Capitalized Amounts, including unpaid interest, to the outstanding balance, those amounts accrue interest based on the terms of this Agreement. Borrower further understands that the Capitalized Amounts would not accrue interest without this Agreement.

Modified Monthly Payment Amount: You promise to make modified monthly INTEREST-ONLY payments in an amount set forth in the table below for a 60 month period beginning with the first interest-only payment due on October 1, 2017 and ending with the last interest-only payment due on September 1, 2022 (the "Interest-Only Period"). During the 60 month Interest-Only Period, the total modified monthly payment amount will include monthly interest-only payments and may include any monthly escrow payments (to the extent Servicer will pay escrowed amounts) and monthly payments for Ancillary Amounts, as identified below.

At the end of the Interest-Only Period, Borrower promises to make monthly PRINCIPAL-AND-INTEREST payments beginning with the first payment due after September 1, 2022 and ending on the Maturity Date (the "Principal-and-Interest Period"). During the Principal-and-Interest Period, the total monthly payment amount will include monthly principal-and-interest payments and may include any monthly escrow payments (to the extent Servicer will pay escrowed amounts).

59.    Even though LSF9 and Caliber had acted illegally against her, Ms. Martinson accepted

LSF9's and Caliber's final modification described in the previous paragraph on August 16, 2017

to help mitigate the overall situation. She he did not waive any rights or claims she had against

LSF9, Caliber, or their agents by doing so. Caliber on behalf of LSF9 countersigned the final

modification thereafter on August 25, 2017.

60.    Caliber and LSF9 capitalized into Ms. Martinson's loan modification certain sums LSF9

and Caliber were not permitted to collect directly and indirectly while LSF9 was acting illegally

as an unlicensed collection agency—i.e. interest then claimed due from Ms. Martinson, late

charges claimed due from Ms. Martinson, fees and costs; and outstanding foreclosure fees and

costs. In addition, also included in the sums capitalized were other sums, as discussed *supra*,

Caliber and LSF9 knew as a matter of law it was not entitled to collect from Ms. Martinson regardless of LSF9's license status—i.e. property inspection fees and foreclosure costs and fees from the *Martinson Action* which Caliber and LSF9 were not entitled to pursue by virtue of the final order of the Circuit Court for Carroll County, Maryland.

61.     With LSF9's and Caliber's authority and even though LSF9 and Caliber knew the Martinson Loan had been approved for LSF9's standard modification/forbearance agreement, LSF9's appointed agents improperly appealed the *Martinson Action*. The controversy between Ms. Martinson and LSF9 and Caliber subject to the *Martinson Action* was moot by virtue of her modification/forbearance agreement discussed *supra.*

62.     Ms. Martinson incurred attorney fees to defend against LSF9's improper, deceptive, and unfair collection attempt to appeal the *Martinson Action*.

63.     On October 17, 2017, Caliber on behalf of LSF9, wrote to Ms. Martinson and generally disclosed to her how it had applied the sums it had claimed due from her into LSF9's standard modification/forbearance agreement dated August 7, 2017:

| Past Payments Breakdown: | Recently Paid | Paid Year-To-Date |
|---|---|---|
| Principal | $83,847.55 | $1,013.68 |
| Interest | $49,809.32 | $3,397.18 |
| Escrow (Taxes, Insurance, or PMI/MIP) | $1,237.51 | $2,046.65 |
| Fees | $0.00 | $0.00 |
| Late Charges | $0.00 | $0.00 |
| Unapplied Balance | ($1,005.04) | $0.00 |
| Total | $133,889.3 | $6,457.51 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## Transaction Activity (08/02/17 - 10/17/17)

| Transaction Date | Transaction Description | Transaction Amount | Principal | Interest | Escrow | OPT/INS | Late Charges | Unapplied Funds | Fees |
|---|---|---|---|---|---|---|---|---|---|
| 07-27-2017 | Single Item Receipt | $1,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$1,000.00 | $0.00 |
| 07-27-2017 | Mortgage Payment | $1,092.00 | $0.00 | $688.33 | $404.57 | $0.00 | $0.00 | $0.00 | $0.00 |
| 07-27-2017 | Single Item Receipt | -$997.48 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$997.48 | $0.00 |
| 07-27-2017 | Single Item Receipt | $1,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$1,000.00 | $0.00 |
| 08-02-2017 | Single Item Receipt | -$1,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$1,000.00 | $0.00 |
| 08-25-2017 | Loan Mod Capitalized | -$1,225.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$1,225.00 |
| 08-25-2017 | Loan Mod Capitalized | -$461.48 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$461.48 |
| 08-25-2017 | Loan Mod Capitalized | -$150.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$150.00 |

## Transaction Activity (08/02/17 - 10/17/17) (Continued)

| Transaction Date | Transaction Description | Transaction Amount | Principal | Interest | Escrow | OPT/INS | Late Charges | Unapplied Funds | Fees |
|---|---|---|---|---|---|---|---|---|---|
| 08-25-2017 | Loan Mod Capitalized | -$565.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$565.00 |
| 08-25-2017 | Loan Mod Capitalized | -$50.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$50.00 |
| 08-25-2017 | Loan Mod Capitalized | -$75.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$75.00 |
| 08-25-2017 | Loan Mod Capitalized | -$908.20 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$908.20 |
| 08-25-2017 | Loan Mod Capitalized | -$150.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$150.00 |
| 08-25-2017 | Loan Mod Capitalized | -$550.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$550.00 |
| 08-25-2017 | Loan Mod Capitalized | -$720.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$720.00 |
| 08-25-2017 | Loan Mod Capitalized | -$25.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$25.00 |
| 08-25-2017 | Loan Mod Capitalized | -$560.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$560.00 |
| 08-25-2017 | Loan Mod Capitalized | -$80.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$80.00 |
| 08-25-2017 | Loan Mod Capitalized | -$200.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$200.00 |
| 08-25-2017 | Loan Mod Capitalized | -$445.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$445.00 |
| 08-25-2017 | Loan Mod Capitalized | -$360.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$360.00 |
| 08-25-2017 | Loan Mod Capitalized | -$115.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$115.00 |
| 08-25-2017 | Loan Mod Capitalized | -$175.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$175.00 |
| 08-25-2017 | Loan Mod Capitalized | -$381.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$381.00 |
| 08-25-2017 | Loan Mod Capitalized | -$105.67 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$105.67 |
| 08-25-2017 | Loan Mod Capitalized | -$234.19 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$234.19 |
| 08-25-2017 | Loan Mod Capitalized | -$225.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$225.00 |
| 08-25-2017 | Loan Mod Capitalized | -$118.50 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$118.50 |
| 08-25-2017 | Loan Mod Capitalized | -$4.25 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$4.25 |
| 08-25-2017 | Loan Mod Capitalized | -$14.74 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$14.74 |
| 08-25-2017 | Single Item Receipt | $85.50 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $85.50 | $0.00 |
| 08-29-2017 | Single Item Receipt | $1,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,000.00 | $0.00 |
| 08-25-2017 | Mortgage Payment | $1,082.58 | $0.00 | $666.11 | $416.47 | $0.00 | $0.00 | $0.00 | $0.00 |
| 08-25-2017 | Payment To Principal | $10.48 | $10.48 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 08-28-2017 | Payment To Principal | $1,000.00 | $1,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$1,000.00 | $0.00 |
| 08-28-2017 | Mortgage Payment | $1,082.58 | $0.00 | $666.11 | $416.47 | $0.00 | $0.00 | $0.00 | $0.00 |
| 08-28-2017 | Payment To Principal | $10.48 | $10.48 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 08-28-2017 | Payment To Principal Reversal | -$10.48 | -$10.48 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 08-28-2017 | Payment Reversal | -$1,082.58 | $0.00 | -$666.11 | -$416.47 | $0.00 | $0.00 | $0.00 | $0.00 |
| 08-31-2017 | Single Item Receipt | -$1,093.06 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$1,093.06 | $0.00 |
| 09-06-2017 | Property Taxes | $1,837.04 | $0.00 | $0.00 | $1,837.04 | $0.00 | $0.00 | $0.00 | $0.00 |
| 10-03-2017 | Single Item Receipt | $85.75 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $85.75 | $0.00 |
| 10-03-2017 | Mortgage Payment | $996.80 | $0.00 | $666.06 | $416.47 | $0.00 | $0.00 | -$85.75 | $0.00 |
| 10-03-2017 | Payment To Principal | $3.20 | $3.20 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

64.     Ms. Martinson has asked Caliber on behalf of LSF9 to apply her payments on LSF9's standard modification/forbearance agreement in accordance with Maryland law. Caliber on behalf of LSF9 has failed to do so and instead has applied Ms. Martinson's payments tendered to it by her and applied these payments to certain categories of income (i.e. profit) LSF9 is not permitted to collect as an unlicensed collection agency (*see* ¶ 3 *supra*).

65.     After the Martinson Loan into LSF9's standard modification/forbearance agreement, Caliber continued to collect interest, fees, and costs from Ms. Martinson on behalf of LSF9 on a regular basis.

66.     The interest, fees, and costs collected by Caliber on behalf of LSF9 from Ms. Martinson are liquidated sums that are known to the Defendants since they are required to track all sums collected from borrowers as part of the business practices.

67.     Ms. Martinson's damages and losses asserted herein accrued within three years of the commencement of this action and otherwise are tolled by the *Altenburg* action in the U.S. District Court of Maryland.

68.     Ms. Martinson is also entitled to restitution damages and losses from LSF9 since it is not permitted to profit off its illegal activities in Maryland. To suggest otherwise would permit LSF9 to retain profits from its illegal activity.

### C.    FACTS ABOUT NAMED PLAINTIFF MR. LEWIS

69.     On or about January 26, 2007 Mr. Lewis refinanced the Lewis Property, his home and property, with Household Finance Corporation III ("HFC") ("Lewis Loan"). He refinanced the loan for personal, consumer purposes changing his then existing loan terms. The proceeds of this refinance were used entirely for these personal, consumer purposes.

70.     Due to a reduction of household income, Mr. Lewis was not able to continue to make payments on the Lewis Loan were not made and the Lewis Loan became in default as of May 1, 2015.

71.     On June 6, 2016, LSF9 acquired ownership interest in the Lewis Loan and its associated Deed of Trust recorded in the land records for Prince George's County, Maryland. In an Assignment of Mortgage/Deed of Trust recorded in the land records of Prince George's County,

Maryland (Book 38447, Page 242) LSF9 was assigned all of HFC's "right, title and interest in and to said Mortgage in the amount of $547,325.24."

72.    As the time of this assignment of the Lewis Loan to LSF9, Caliber was its authorized mortgage servicer. In addition, at this time both Caliber and LSF9 believed the Lewis Loan was in default. LSF9 acquired the Lewis Loan for a sum less the sum then claimed due on the Lewis Loan.

73.    Due to the loan default and without the right to do so as a unlicensed collection agency, LSF9 through Caliber referred Mr. Lewis and the Lewis Property to a foreclosure lawyer on November 28, 2016.

74.    On November 30, 2016 the Law Offices of Jeffrey Nadel wrote to Mr. Lewis and threatened him with foreclosure and legal action on behalf of LSF9. LSF9 knew that this time that it had no legal right to pursue foreclosure against Mr. Lewis, directly or indirectly, through Jeffrey Nadel or any other person. LSF9, and Caliber acting on its behalf, disregarded the prior court judgment against it (Exhibits 1-3) and authorized Jeffrey Nadel to make the foreclosure threats anyway in disregard of their own knowledge.

75.    On January 31, 2017, Mr. Lewis wrote to Jeffrey Nadel, in reliance to and in dispute of Mr. Nadel's contentions in his November 30, 2016 correspondence to Lewis. Mr. Nadel never responded to that correspondence and never withdrew his threat of foreclosure.

76.    On April 5, 2017 Caliber wrote to Mr. Lewis, not at the address for the Lewis Property, but at the address of a previously engaged third party vendor. In that purported correspondence, Caliber offered Mr. Lewis the opportunity to modify the Lewis Loan as follows:

25

Based on our review of your financial circumstances, you are approved for the following modification: Private 5 Year Interest Only Mod Deferment.

You were evaluated for mortgage payment assistance using the eligibility requirements of the investor/owner of your mortgage loan. These requirements for determining borrower eligibility for a loan modification include the use of a hierarchy evaluation approach. This is where borrowers are evaluated for programs in a specific order that is determined by the investor/owner of your loan. As a result, a borrower who is eligible for a modification program higher in the hierarchy order, is ineligible for a modification program lower in the hierarchy, to the extent applicable.

77.     Mr. Lewis did not receive a timely copy of the proposed modification offer which Caliber

sent to the third party vender. The third party vender did not send it to Mr. Lewis until June 20,

2017.

78.     Upon belated receipt of LSF9's standard modification/forbearance agreement described in

the proceeding paragraphs, Mr. Lewis promptly contacted Caliber to explain the situation and that

he did not know about the offer due to the third party vender's negligence in conveying it to him.

Mr. Lewis immediately signed and returned the offer to Caliber and also made the necessary

payments to Caliber on behalf of LSF9 which Caliber agreed to accept and did in fact accept. In

addition, Mr. Lewis memorialized in writing to Caliber the conversations detailing the agreements

made between Caliber on behalf of LSF9 and himself on or about June 23, 2017 as follows:

> I spoke on the phone earlier today with Rolando (#28258) to discuss the trial
> loan modification you had previously offered to us but which Prime Assistance
> did not convey to us the details until this week. At the end of the call, Rolando
> informed me that I needed to take the following steps for the modification to
> be approved:
> 1. Overnight the signed trial plan to your loan modification address;
> 2. Overnight the first two trial period payments by Money Order or Certified
>    Check with the signed trial plan to your loan modification address;
> 3. Make the third trial payment to the loan modification address by July 15,
>    2017.
>
> Since we have now realized that Prime Assistance is a scam company, I also
> informed you in my phone call that Prime Assistance was no longer an
> authorized as a third party on my account, and I wished for all further
> communications to be directed to me personally at the address below. Rolando

26

stated that in order to remove the Prime Assistance as an ATP, I needed to inform you in writing. Therefore, please accept this letter of my notification that Prime Assistance is not an authorized party on my account any more, and is not permitted to access any of my information or speak to anyone on my behalf any further.

Apparently Prime Assistance also sent a cease and desist letter to you. That cease and desist request is hereby fully rescinded and revoked. Please update my account to reflect that all further communications should be sent to:

Ronald Lewis
8133 Grayden Lane
Brandywine, MD 20613

I am also requesting that you send me copies of any papers and communications you previously sent to Prime Assistance, since it evidently failed to share these papers with me and I am uncertain of what if any communications you had.

79.     Caliber acknowledged in writing on July 7, 2017 that it received the correspondence reproduced in the preceding paragraph on June 27, 2017. In that correspondence Caliber on behalf of LSF9 also disclosed to Mr. Lewis the following accounting of the Lewis Loan:

| Account Number | Tran Date | Tran Effective Date | Tran Name | Transaction Amount | Amount To PRI | Amount To Int | Amount To Esc | Amount To LTC | Amount To Fees | Amount To UP | Paid To Date | PRI Balance After Transaction |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9804367499 | 12/15/2015 | 12/15/2015 | ADMINISTRATIVE ADJUSTMENT | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $2,967.18 | 4/1/2015 | $488,614.47 |
| 9804367499 | 12/15/2015 | 12/15/2015 | UNCOLLECTED INTEREST OR LATE CHARGE | $0.00 | $0.00 | $0.00 | $0.00 | ($214.05) | | $0.00 | 4/1/2015 | $0.00 |
| 9804367499 | 12/15/2015 | 12/15/2015 | ADMINISTRATIVE ADJUSTMENT | $0.00 | $0.00 | $0.00 | $0.00 | ($214.05) | | $0.00 | 4/1/2015 | $488,614.47 |
| 9804367499 | 12/15/2015 | 12/15/2015 | ADMINISTRATIVE ADJUSTMENT | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.00 | 4/1/2015 | $488,614.47 |
| 9804367499 | 1/23/2016 | 1/23/2016 | ESCROW DISBURSEMENT | ($1,628.77) | $0.00 | $0.00 | ($1,628.77) | $0.00 | | $0.00 | 4/1/2015 | |
| 9804367499 | 12/13/2016 | 12/13/2016 | FEES BILLED | $250.00 | | | | | $350.00 | | 4/1/2015 | |
| 9804367499 | 1/12/2017 | 1/12/2017 | ESCROW DISBURSEMENT | ($300.00) | $0.00 | $0.00 | ($300.00) | $0.00 | | $0.00 | 4/1/2015 | $488,614.47 |
| 9804367499 | 2/15/2017 | 2/15/2017 | FEES BILLED | $750.00 | | | | | $750.00 | | 4/1/2015 | |
| 9804367499 | 3/13/2017 | 3/13/2017 | FEES BILLED | $118.50 | | | | | $118.50 | | 4/1/2015 | |
| 9804367499 | 6/27/2017 | 6/26/2017 | SINGLE ITEM RECEIPT | $4,172.18 | $0.00 | $0.00 | $0.00 | $0.00 | | $4,172.18 | 4/1/2015 | $488,614.47 |

80.     In Caliber's July 7, 2017 correspondence to Mr. Lewis, while acting as LSF9's servicer, Caliber represented to Mr. Lewis that is had accurately posted all payments made and the Lewis Loan.

81.     Included in the accounting reproduced in ¶ 79 *supra* were sums claimed due by Caliber for "FEES BILLED" on December 13, 2016, February 15, 2017, and March 13, 2017 which upon

information and belief were not actually incurred or lawfully owed to LSF9 by Mr. & Mrs. Lewis since (i) no foreclosure action had ever been actually filed and (ii) LSF9 was unlicensed as a collection agency and was not lawfully permitted to charge for or collect fees from Mr. Lewis while it was acting as an unlicensed professional (*see* ¶ 3 *supra*).

82.     Even though Caliber had acknowledged orally and in writing, as detailed *supra*, that Mr. Lewis did not authorize it to communicate the Lewis Loan with Prime Assistance any further, Caliber knowingly disregarded that notice and sent Mr. Lewis' final modification paperwork to Prime Assistance on July 31, 2017.

83.     In the proposed, final modification offer from Caliber on behalf of LSF9, dated July 31, 2017, Caliber stated as follows to Mr. Lewis:

Thank you for contacting Caliber Home Loans, Inc. ("Caliber") to obtain assistance for your above-referenced loan. Your request for a loan modification has been approved and will be finalized if Caliber receives the following from you **on or before 08/15/2017**:

*   Original copy of the enclosed Modification Agreement signed by each borrower who signed the original loan documents.

Please return to:
Caliber Home Loans, Inc.
**Attn: SPOC Department**
13801 Wireless Way
Oklahoma City, OK 73134

The signed Modification Agreement must be received by the date indicated above. Otherwise, the modification will not be completed, and Caliber may seek to pursue any and all rights under the Note and Security Instrument.

**Loan Modification Review**

Based on our review of your financial circumstances, you are approved for the following modification: Private 5 Year Interest Only Deferment.

You were evaluated for mortgage payment assistance using the eligibility requirements of the investor/owner of your mortgage loan. These requirements for determining borrower eligibility for a loan modification include the use of a hierarchy evaluation approach under which a borrower who is eligible for a modification program higher in the hierarchy is ineligible for a modification program lower in the hierarchy, to the extent applicable.

84.     LSF9's standard modification/forbearance agreement presented to Mr. Lewis in correspondence dated July 31, 2017 also represented the following:

<u>Term Extension</u>: The term of the Note has been extended and the new maturity date of the Loan will be August 1, 2057.

<u>Combined Principal Balance</u>: On the Modification Effective Date, the Combined Principal Balance payable under the note is $618,243.42 (the "Combined Principal Balance"). This amount consists of unpaid and deferred interest, previously deferred amounts, fees, charges, escrow advances, and other costs, but excluding unpaid late charges, less any amounts paid to Servicer but not previously credited to my loan. I understand that by agreeing to add these amounts to the outstanding principal balance, the added amounts accrue interest based on the interest rate in effect under this Agreement unless those amounts are either deferred as non-interest bearing or forgiven as specified in this Agreement.

<u>Debt Forgiveness</u>: $109,743.42 of the Combined Principal Balance is hereby permanently forgiven.

<u>Deferred Amounts</u>: We have agreed to defer your obligation to pay the following amounts (the "Deferred Amounts"):

Deferred Principal: $48,753.34

Deferred Amounts Other Than Principal: $21,605.51

Deferred Amounts do not accrue interest. The Deferred Amounts will be due at the earlier of payment in full of the Note, or the Maturity Date. If you sell the Property or refinance the Loan, you will be required to pay this Deferred Amount in addition to any other amounts due at that time. Otherwise, these amounts are due on the Maturity Date and are required to be paid at or before that time. This means that if you make all the payments required by this Agreement, you will still owe the Deferred Amount to Servicer. The Deferred Amount may result in a significantly higher monthly payment on the Maturity Date.

<u>Interest Bearing Principal Balance</u>: The Combined Principal Balance minus the Deferred Amounts and Debt Forgiveness amount shall be referred to as the "Interest Bearing Principal Balance" and this amount is $438,141.15.

85.    LSF9's standard modification/forbearance agreement presented to Mr. Lewis in correspondence dated July 31, 2017 called for him to make "interest only payments" for five years. As an unlicensed collection agency LSF9 is not lawfully permitted to charge for or collect interest from Mr. & Mrs. Lewis while it was acting as an unlicensed professional (*see* ¶ 3 *supra*). To suggest otherwise would mean that an unlicensed, so-called professional could profit from its illegal activities.

86.    In reliance to Caliber's representations on behalf of LSF9, Mr. Lewis signed and returned the final modification paperwork required by LSF9's standard modification/forbearance agreement and returned it to Caliber who received it on or before August 15, 2017 at the address it identified to receive such documents. Caliber countersigned the modification and mailed back to Mr. Lewis a countersigned copy on or about September 7, 2017.

87.     Mr. Lewis did not waive any rights or claims he had against LSF9, Caliber, or their agents by agreeing to LSF9's standard modification/forbearance agreement.

88.     Caliber and LSF9 capitalized into Mr. Lewis' loan modification certain sums LSF9 and Caliber were not permitted to collect directly and indirectly while LSF9 was acting illegally as an unlicensed collection agency—i.e. interest then claimed due from Mr. Lewis, late charges claimed due from Mr. Lewis, fees and costs; and outstanding foreclosure fees and costs. In addition, also included in the sums capitalized were other sums, as discussed *supra*, Caliber and LSF9 knew as a matter of law it was not entitled to collect from Ms. Lewis regardless of LSF9's license status.

89.     Mr. Lewis has asked Caliber on behalf of LSF9 to apply his payments on LSF9's standard modification/forbearance agreement in accordance with Maryland law. Caliber on behalf of LSF9 has failed to do so and instead has applied Mr. Lewis' payments tendered to it by him and applied these payments to certain categories of income (i.e. profit) LSF9 is not permitted to collect as an unlicensed collection agency (*see* ¶ 3 *supra*).

90.     After the Lewis Loan was altered by LSF9's standard modification/forbearance agreement, Caliber continued to collect interest, fees, and costs from Mr. Lewis on behalf of LSF9 on a regular basis.

91.     The interest, fees, and costs collected by Caliber on behalf of LSF9 from Mr. Lewis are liquidated sums that are known to the Defendants since they are required to track all sums collected from borrowers as part of their business practices.

92.     Mr. Lewis' damages and losses asserted herein accrued within three years of the commencement of this action and otherwise are tolled by the *Altenburg* action in the U.S. District Court of Maryland.

93. Mr. Lewis is also entitled to restitution damages and losses from LSF9 since it is not permitted to profit off its illegal activities in Maryland. To suggest otherwise would permit LSF9 to retain profits from its illegal activity.

## D. FACTS RELATED TO THE DEFENDANTS AND THE CLAIMS BEFORE THIS COURT

94. A primary portion of Caliber's mortgage servicing portfolio, according to published reports, includes servicing for non-performing, sub-performing, and distressed assets like those acquired by LSF9. See http://www.nytimes.com/2015/09/29/business/dealbook/as-banks-retreat-private-equity-rushes-to-buy-troubled-home-mortgages.html. The value of Caliber's and SPS' book of business exceeds $50,000,000.00. This estimate is based on the fact that Caliber and SPS retain a portion of sums its collects for its clients, including LSF9, as part of their collections work.

95. A primary portion of LSF9's business is to acquire non-performing, defaulted loans for sums less than what is claimed due on each loan and then to proceed to collect directly and indirectly on the loans. The value of LSF9's assets exceeds $50,000,000.00.

96. LSF9 is not now and never has been licensed as a Maryland collection agency. It has however, acted as an unlicensed collection agency and a debt collector by demanding and attempting to collecting through its authorized agents, including Caliber and BWW, sums it is not legally entitled to collect from Named Plaintiffs and the Class members since it is acting without a mandatory license as a collection agency because its business model is simply to acquire defaulted debts in default for pennies on the dollar of what is claimed to be due and owing from borrowers like the Named Plaintiffs and Class members.

97. Caliber relied upon the records of LSF9 for its belief that the Named Plaintiffs and the Class members' loans were in default at the time it acquired the servicing rights of their loans and performed no investigation of the facts available to it.

31

98.     Caliber, as the debt collector, has communicated directly or indirectly concerning consumer debts owned by LSF9 with demands and threats for payments and threats and actual acts to take judicial action against the Named Plaintiffs and Class members through BWW and the Law Offices of Jeffrey Nadel and others on behalf of LSF9, including foreclosure, even though LSF9 has no legal right to collect indirectly through Caliber as an unlicensed collection agency through foreclosure or otherwise.

99.     Caliber does act as a collector and debt collector with the expectation to make non-performing loans (it collects upon) performing loans again for the long term but instead focus on whether it may obtain a greater profit by foreclosing on the secured asset to pay the debt. According to a public filing, Caliber's practice is described as follows:

> Caliber uses a loan modification decision model to produce a "net present value" analysis as part of its decision. If the net present value of a modification is greater than the net present value of a foreclosure, loan sale or short sale; Caliber will offer the mortgagor a modification. As part of the loan modification analysis, Caliber collects financial information and orders credit reports to determine current debt-to-income ratios and affordability.

Loan Purchase Agreement as between LSF9 and Chase, filed in *In re Silva* (Case No. 13-23184), U.S. Bankruptcy Court for the Southern District of New York. *Also available* at http://www.nytimes.com/interactive/2016/06/24/business/dealbook/document-private-equity-housing.html#document/p1/a304393 (last visited on October 1, 2016).

100.    In other words, the stated policy in the preceding paragraph demonstrates that if foreclosing is the most profitable option, LSF9 is likely to foreclose. Caliber's standard and primary modification is simply a forbearance agreement in which it typically requires a large-up-front payment and then payments to forbear foreclosure if a borrower makes payments for a period of time but the once the forbearance period is concluded the original, unaffordable loan terms are reinstated. Since Caliber does not reduce the inflated loan principals of the loans it acquires at a

32

significant discount, its standard forbearance agreement is simply putting off for the short-term any foreclosure and Caliber and LSF9 expect to liquidate the loan's secured property at some time in a period of less than the normal term of loan modifications by other, more traditional debt collectors of similar loans--which is 30-40 years.

### E. THE DEFENDANTS' LEGAL DUTIES RELATED TO THE SUBJECT TRANSACTIONS SUBJECT TO THIS ACTION

101.    The Court of Appeals in 2005 recognized that a real estate professional who had no direct communication with a borrower nevertheless had a duty to a consumer under the Maryland Consumer Protection Act and Maryland common law to make a "reasonable investigation" of the true facts in the real estate transaction on which the borrower (and other parties) would rely in order to complete the transaction. *Hoffman v. Stamper*, 385 Md. 1, 867 A.2d 276 (2005). This duty of care applies to Caliber and LSF9 as their work involves secured, consumer mortgage loans acquired while in default.

102.    Since 1970, "if a statute requiring a license for conducting a trade, business or profession is regulatory in nature for the protection of the public, rather than merely to raise revenue, an unlicensed person will not be given the assistance of the courts in enforcing contracts within the provisions of the regulatory statute because such enforcement is against public policy." *Harry Berenter, Inc. v. Berman*, 258 Md. 290, 293, 265 A.2d 759, 761 (1970). This duty to be licensed before utilizing the state courts applies to LSF9 which acts as a collection agency but is not licensed as one.

103.    Pursuant to 12 U.S.C.A. § 2605(k)(1)(C)(E), Caliber has duties to the Named Plaintiffs and the Class members to (i) take appropriate steps to avoid foreclosure as part of its standard servicer's duties and (ii) comply with any other obligation(s) found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of 12

33

U.S.C.A. § 2605. Pursuant to 12 C.F.R. § 1024.38(b)(1)(i), Caliber is required to "[p]rovide accurate and timely disclosures to a borrower as required by [12 C.F.R. § 1024.38] or other applicable law." Pursuant to 12 C.F.R. § 1024.35(b)(5), Caliber is not permitted to "impos[e]… a fee or charge that the servicer lacks a reasonable basis to impose upon the borrower." It is unreasonable and a violation of its duties for Caliber to demand inaccurate sums due to LSF9 which is an unlicensed collection agency and has no right to collect any sums from the Named Plaintiffs and putative class members while not licensed.

104. The Maryland Mortgage Fraud Protection Act, MD. CODE ANN., REAL PROP. § 7-401, *et seq.*, establishes a statutory duty upon LSF9 and Caliber to disclose to mortgage borrowers and homeowners, like the Named Plaintiffs and the Class members in this action, to disclose material information with respect to the mortgage lending process which includes the servicing and foreclosure (and threatened foreclosure of mortgage loans). *Ademiluyi v. PennyMac Mortgage Inv. Trust Holdings I, LLC*, 929 F. Supp. 2d 502, 531 (D. Md. 2013); *Castle v. Capital One, N.A.*, No. CIV.A. WMN-13-1830, 2014 WL 176790, at *5 (D. Md. Jan. 15, 2014; *Stovall v. SunTrust Mortgage, Inc.*, No. CIV.A. RDB-10-2836, 2011 WL 4402680 (D. Md. Sept. 20, 2011). In this case Caliber and LSF9 have duties to disclose to the Named Plaintiffs and the Class members (and the state courts) that LSF9 is unlicensed as a collection agency and they have failed to do so. *Compare McDaniel v. Baranowski*, 419 Md. 560, 587, 19 A.3d 927, 943 (2011).

## F. MARYLAND'S RESPONSE TO THE UNLICENSED COLLECTION AGENCY AND DEBT COLLECTION CRISIS AS RELATED TO THE PLAINTIFF

105. As part of its routine and on-going collection practices, LSF9 regularly collects or attempts monthly mortgage payments and/or forbearance payments or short-payoffs by and through the mails and interstate wires through its authorized servicer Caliber from the Named Plaintiffs and the Class members. LSF9 and Caliber also attempt to collect from the same through civil litigation

in Maryland Courts authorized by it and through its authorized agents, including actions which are filed as foreclosure actions in the state courts and also through bankruptcy proceedings in the United States Bankruptcy Court for Maryland.

106.    Under MD CODE ANN., BUS. REG. §7-301, a person must have a license to do business as a collection agency in the State of Maryland.

107.    The Maryland Commissioner of Financial Regulation, the state regulator of persons who acquire consumer debt after default and file lawsuits in Maryland to collect the debt, has clearly stated that:[8]

> ... 4. The position of the Agency is that, unless otherwise exempt, a person who brings actions in Maryland State courts to collect consumer claims which were acquired when the claims were in default is knowingly and willfully doing business as a "collection agency" in the State under [Bus. Reg.] § 7-101(c). This includes, but is not limited to, the named Plaintiffs in such judicial actions, which will normally be the owners of the consumer debt.
>
> 5. Thus the Agency's position is that a Plaintiff in a Maryland State court action brought to collect a consumer claim which was acquired when the claim was in default is required to be licensed as a collection agency under MCALA, and is subject to the regulatory authority of the Agency in the conduct of that litigation.
>
> 6. The position of the Agency is that a person who brings judicial actions in Maryland State courts to collect consumer claims which were acquired when the claims were in default also meet the definition of "collector" under CL § 14-201(b) of the Maryland Consumer Debt Collection Act ("MCDCA," at Commercial Law Article ("CL"), § 14-201 et seq., Annotated Code of Maryland) and of "debt collector" under 15 U.S.C. § 1692(a) of the Fair Debt Collection Practices Act ("FDCPA," at 15 U.S.C. § 1692, et seq.)...

108.    Every collection effort in Maryland authorized by Caliber on behalf of LSF9 (who is acting without a Collection Agency license), including each and every foreclosure action filed in Maryland courts on its behalf as well as the collection and attempted collection of any mortgage payments,

---

[8] *In the Matter of: Midland Funding, LLC, et al.,* before the Maryland State Collection Agency Licensing Board in the Office of the Commissioner of Financial Regulation, CFR-FY-2010-063.

and each and every judgment lien filed in Maryland, is an unfair or deceptive trade practice since these actions were committed without the right to do so as stated by the legislature.

109. Before the 2007 session of the Maryland General Assembly, debt buyers like LSF9 sought to avoid Maryland statutes and regulation by asserting that they were not subject to Maryland statues addressing collection agencies. *See*, Legislative History for 2007 chap. 472 (Bus. Reg. 7-101) HB 1324. As a result the 2007 General Assembly required LSF9, and other debt buyers who acquire defaulted, consumer debts for less than the sums claimed due, to acquire a license by October 1, 2007. *Id.* All persons had/have knowledge of the law.

110. Then Maryland Commissioner of Financial Regulation, Charles W. Turnbaugh, explained the purpose of the bill, HB 1324, at the time as follows:

> … The law does not require licensing for businesses that only collect their **own** consumer debts, unless the business uses a name or other artifice that indicates that another party is attempting to collect the consumer debt. However, the evolution of the debt collection industry has created a "loophole" used by some entities as a means to circumvent current State collection agency laws. Entities, such as "debt purchasers" who enter into purchase agreements to collect delinquent consumer debt rather than acting as an agent for the original creditor, currently collect consumer debt in the State without complying with any licensing or bonding requirement. The federal government has recognized and defined debt purchasers as collection agencies, and requires that these entities fully comply with the Federal Fair Debt Collection Practices Act. **This legislation would include debt purchasers within the definition of a "collection agency," and require them to be licensed by the Board before they may collect consumer claims in this State** … [emphasis added].

111. However, LSF9 has attempted to collect from Named Plaintiffs and the Class through Caliber while it did not have the mandatory license required by MCALA and continued its business of collecting debts acquired in default and filing collection lawsuits in Maryland courts without the right to do so. Caliber has known that LSF9 was unlicensed but it acted anyway even though it knew, as any other person knew, under Maryland law LSF9 was required to be licensed.

112.    The Office of the Commissioner of Financial Regulation, a division within the Department of Labor, Licensing and Regulation ("Agency") and the Maryland State Collection Agency Licensing Board ("Board"), as the agencies charged with enforcement of the Maryland Collection Agency Licensing Act, have consistently taken the position that Consumer Debt Purchasers--i.e. persons who acquire consumer debt which is in default at the time of acquisition and who collect such debt through civil litigation--are 'collection agencies' and are subject to the licensing requirements of the Maryland Collection Agency Licensing Act. Affidavit of Gordon M. Cooley at ¶ 5, Commissioner of Financial Regulation (dated May 10, 2016).[9]

113.    Following enactment of HB 1324 the Maryland Commissioner of Financial Regulation issued its position on the change in law as DLLR Advisory Notice No. 07-06 ("Advisory"). The Advisory clearly stated the Commissioner's official position on the changes to MCALA, i.e.: "… effective October 1, 2007 any person engaged in the collection of a consumer claim the person owns, if the claim was in default when the person acquired it, is required to be licensed as a collection agency pursuant to HB 1324 …".

114.    Even though multiple state circuit courts throughout the State of Maryland have held that LSF9 had no right to attempt to collect indirectly or directly in the State of Maryland, as demonstrated *supra*, LSF9 has continued attempt to collect and actually collected from the Named Plaintiffs and the putative class members in disregard of the findings and order of the various court orders against it.

115.    Even though it has had sufficient notice that that LSF9 has no legal right to collect in the State of Maryland while acting as an unlicensed collection agency as described *supra*, Caliber

---

[9] This document was filed in Case No. 24-C-11-007101 as an Exhibit to the Office of the Commissioner of Financial Regulation's Motion to Quash (Doc. 110) in the Circuit Court for Baltimore City, Maryland.

reported debts of the Named Plaintiffs and the Class members to the credit bureaus for the purpose of pressuring the named Plaintiffs and the Class members to pay a debt to LSF9 in more than fifty other instances.

116.    LSF9 has willfully and knowingly sought, directly or indirectly, to collect debts on behalf of its unlicensed principals (i.e. LSF9), including threatened to utilize the foreclosure process when LSF9 has no legal right to pursue the foreclosure process. Caliber has also recklessly disregarded the notice before it in the proceeding paragraphs, failed to conduct reasonable investigations to inquiries it received, and instead proceeded in its collection attempts with knowledge that LSF9 was an unlicensed collection agency. Further, Caliber has conspired with LSF9 and its affiliates to collect on LSF9's behalf even though LSF9 has no legal right to collect without the mandatory license required by Maryland law (either directly or indirectly). These are material misrepresentations and false statements and omissions by Caliber which would and have mislead the least sophisticated consumer by: (i) enticing voluntary payments for sums not legally collectable by LSF9 or (ii) led an unsophisticated consumer to forgo a valid defense as recognized by various state court orders.

## Named Plaintiffs' Class Allegations

117.    This action is also properly brought as a Class under MD. RULE 2-231. Named Plaintiffs propose, as the definition of the **SPS Class**, that it be defined as follows:

> Those persons who paid, directly or indirectly, any amount to LSF9 which were applied by SPS to interest, fees, costs, and other charges other than the principal portion of payments due from them.

118.    This action is also properly brought as a Class under MD. RULE 2-231. Named Plaintiffs propose, as the definition of the **Caliber Class**, that it be defined as follows:

Those persons who paid, directly or indirectly, any amount to LSF9 which were applied by Caliber to interest, fees, costs, and other charges other than the principal portion of payments due from them.

119.    This action is also properly brought as a Class under MD. RULE 2-231. Named Plaintiffs propose, as the definition of the **Inspection Fee Class,** that it be defined as follows:

Those persons in the State of Maryland from whom LSF9 has collected property inspection fees from which were capitalized into any loan modification agreement executed on its behalf by Caliber.

120.    The particular members of the SPS Class, Caliber Class, and Inspection Fee classes are capable of being described without difficult managerial or administrative problems. The members of the SPS Class, Caliber Class, and Inspection Fee are also readily identifiable from the information and public records available through the State of Maryland Land Records and the Office of the Commissioner of Financial Regulation. Upon information and belief, based on a review of public records, the size of the SPS Class, Caliber Class, and Inspection Fee classes exceeds at least fifty persons for each class.

121.    The SPS Class, Caliber Class, and Inspection Fee members are sufficiently numerous that individual joinder of all members is impractical. This allegation is based in part on the fact that LSF9 acquired many Deeds of Trust, and the loans related thereto, according to public records, throughout the State of Maryland related to the Named Plaintiffs and the SPS Class, Caliber Class, and Inspection Fee class members. Further, according to public records LSF9, through SPS and Caliber, has attempted and/or actually utilized the collection tools of the state courts to collect from SPS Class, Caliber Class, and Inspection Fee class members but not disclosed to those courts that it is not permitted to do so.

122.    There are questions of law and fact common to the SPS Class, Caliber Class, and Inspection Fee classes which predominate over any questions affecting only individual members of the SPS

Class, Caliber Class, and Inspection Fee classes and, in fact, the wrongs alleged against SPS, Caliber, and LSF9 by the SPS Class, Caliber Class, and Inspection Fee class members and the remedies sought by Named Plaintiff and the SPS Class, Caliber Class, and Inspection Fee class against the Defendants are identical, the only difference being the exact sum which each SPS Class, Caliber Class, and Inspection Fee class member is entitled to receive.

123.   The common issues related to SPS Class include, but are certainly not limited to:

     i.    Whether LSF9 was licensed as a collection agency and if so at what time;

     ii.    Whether SPS has the right to collect on behalf of LSF9 while it was unlicensed as a collection agency;

     iii.    Whether the SPS Class members are third party beneficiaries of SPS' duty of good faith under its license pursuant to Md. Code Regs. 09.03.06.20, 12 U.S.C.A. § 2605, and 12 U.S.C.A. § 2605's Regulation X?

     iv.    Whether LSF9 is entitled to any relief by a Maryland Court when LSF9 was acting as unlicensed collection agency?

     v.    Whether LSF9, or anyone else acting on their behalf, ever disclosed to the Named Plaintiffs and the SPS Class members and the Maryland Courts as part of their collection attempts that LSF9 did not have the required collection agency license;

     vi.    Whether putative class claims presented before the Federal Court in the Altenburg Action tolled any statute of limitations for the SPS Class members?

     vii.    Whether SPS's and LSF9's concealment of the true facts concerning LSF9's illegal status should toll any limitations period(s) applied to the SPS Class' claims;

viii.    Whether SPS concealed from members of the SPS Class that LSF9 was not licensed as a collection agency and had no right to collect in the State of Maryland without the license;

ix.    Whether SPS is permitted to continue collecting upon the loans of the SPS Class members;

x.    Whether SPS and LSF9 may assess to the accounts of the SPS Class members the interest, fees and expenses they incurred by utilizing the state court system illegally since LSF9 was acting as an unlicensed collection agency and unlicensed professionals are not permitted to profit from their illegal activities?

124.    The common issues related to the Caliber Class include, but are certainly not limited to:

i.    Whether LSF9 was licensed as a collection agency and if so at what time;

ii.    Whether SPS has the right to collect on behalf of LSF9 while it was unlicensed as a collection agency;

iii.    Whether the Caliber Class members are third party beneficiaries of Caliber's duty of good faith under its license pursuant to Md. Code Regs. 09.03.06.20, 12 U.S.C.A. § 2605, and 12 U.S.C.A. § 2605's Regulation X?

iv.    Whether LSF9 is entitled to any relief by a Maryland Court when LSF9 was acting as unlicensed collection agency?

v.    Whether LSF9, or anyone else acting on their behalf, ever disclosed to the Named Plaintiffs and the Caliber Class members and the Maryland Courts as part of their collection attempts that LSF9 did not have the required collection agency license;

vi.    Whether putative class claims presented before the Federal Court in the Altenburg Action tolled any statute of limitations for the Caliber Class members?

vii. Whether Caliber's and LSF9's concealment of the true facts concerning LSF9's illegal status should toll any limitations period(s) applied to the Caliber Class' claims;

viii. Whether Caliber concealed from members of the Classaliber that LSF9 was not licensed as a collection agency and had no right to collect in the State of Maryland without the license;

ix. Whether Caliber is permitted to continue collecting upon the loans of the Caliber Class members;

x. Whether Caliber and LSF9 may assess to the accounts of the Caliber Class members the interest, fees and expenses they incurred by utilizing the state court system illegally since LSF9 was acting as an unlicensed collection agency and unlicensed professionals are not permitted to profit from their illegal activities?

125. The common issues related to the Inspection Fee Class members include, but are certainly not limited to:

i. Whether LSF9 is entitled to demand and capitalized into loan modification property preservation and/or inspection fees on the mortgage loan accounts of the Inspection Fee Class;

ii. Whether LSF9 is entitled to demand and collect, directly or indirectly through Caliber or SPS, upon property preservation and/or inspection fees capitalized into the mortgage modifications of the Inspection Fee Class members;

iii. Whether this Court may declare that LSF9's practices and policies concerning the capitalization of property preservation fees against the mortgage loan accounts of

the Inspection Fee Class members violate COM. LAW § 12-121(b) and *Taylor v. Friedman*, 344 Md. 572, 584 (1997);

iv.  Do the inspection fees charges collected by LSF9, directly or indirectly through Caliber or SPS, against the Inspection Fee class members' accounts constitute "interest" as that term is defined in COM. LAW § 12-101(e) and therefore also constitute "usury" as that term is defined in COM. LAW § 12-101(k); and

v.  Whether LSF9 is liable for statutory damages pursuant to Inspection Fee class members pursuant to COM. LAW § 12-121(a)(1)(ii) for each separate property inspection fee which was capitalized into a loan modification offered by LSF9 to an Inspection Fee Class member's account.

126.  Named Plaintiffs' legal and equitable claims are typical of and identical to each member of the SPS Class, Caliber Class, and Inspection Fee classes and will be based on the same legal and factual theories.

127.  LSF9's, Caliber's, and SPS' defenses (which defenses are denied) would be typical of and identical for each member of the SPS Class, Caliber Class, and Inspection Fee classes and will be based on the same legal and factual theories.

128.  The Named Plaintiffs will also fairly and adequately represent and protect the interests of the SPS Class, Caliber Class, and Inspection Fee classes. Named Plaintiffs have retained counsel experienced in consumer class actions including actions involving unlawful lending and debt collection practices. Named Plaintiffs do not have any interests which might cause them not to vigorously prosecute this action or that are otherwise adverse to the interests of the members of the SPS Class, Caliber Class, and Inspection Fee classes.

129. Certification of a SPS Class, Caliber Class, and Inspection Fee classes is appropriate under MD. RULE 2-231(b)(2) and (b)(3) is appropriate as to the SPS Class, Caliber Class, and Inspection Fee class members in that common questions predominate over any individual questions and a class action is superior for the fair and efficient adjudication of this controversy. A class action will cause an orderly and expeditious administration of SPS Class, Caliber Class, and Inspection Fee class members' claims, and economies of time, effort and expenses will be fostered and uniformity of decisions will be ensured.

130. Named Plaintiffs' claims are typical of the claims of the SPS Class, Caliber Class, and Inspection Fee class members.

131. Named Plaintiffs will fairly and adequately protect the interests of all SPS Class, Caliber Class, and Inspection Fee class members in the prosecution of this action. They are similarly situated with, and have suffered injuries similar to the members of the SPS Class, Caliber Class, and Inspection Fee classes they seek to represent. Named Plaintiffs have been wronged, wish to obtain redress of the wrong, and want the Defendants stopped from enriching themselves via illegal activities or otherwise perpetrating similar wrongs on others on behalf of unlicensed collection agencies.

132. LSF9's, SPS', and Caliber's failure to disclose the true status of LSF9 to Named Plaintiffs and the SPS Class, Caliber Class, and Inspection Fee class members tolled the running of any limitations that may otherwise apply to the claims of the Named Plaintiff and the members of the SPS Class, Caliber Class, and Inspection Fee class members until LSF9, SPS, and Caliber made the disclosures they were required to make.

133. Caliber and SPS have known since 2007 that LSF9 was required to have a license to act as a collection agency in the State of Maryland. Instead of requiring LSF9 to comply with the law

before they began to act on its behalf, Caliber and SPS chose to evade the path described above to improperly circumvent Maryland law and improperly lend their licenses to LSF9. At all times relevant and material to this action, with knowledge that LSF9 failed to obtain the required license to act as collection agencies, Caliber and SPS attempted to collect or actually collect on its behalf from the Named Plaintiffs and SPS Class, Caliber Class, and Inspection Fee class members.

134. The Named Plaintiff and members of the SPS Class, Caliber Class, and Inspection Fee classes were not required to assume that LSF9 were engaging in illegal activities with the aid and assistance of SPS and Caliber. The Named Plaintiffs and members of the SPS Class, Caliber Class, and Inspection Fee classes were reasonable in not assuming that Caliber or SPS were aiding LSF9's illegal activities.

135. Any limitations period that may otherwise apply to claims of the Named Plaintiffs and members of the SPS Class, Caliber Class, and Inspection Fee class members is tolled by the Altenburg Action in the Federal Court and also since LSF9, Caliber, and SPS had duties to disclose material facts to the Named Plaintiffs and SPS Class, Caliber Class, and Inspection Fee class members related to LSF9's illegal status. The omission of this fact made LSF9's, Caliber's, and SPS' acts unfair or deceptive.

136. Due to their presumed and actual knowledge, as described *supra*, LSF9, Caliber, and SPS had an appreciation that they were not entitled to receive the benefits they were attempting to collect or actually collecting from the Named Plaintiffs and SPS Class, Caliber Class, and Inspection Fee class members.

137. Named Plaintiffs and the Caliber Class and SPS class members are entitled to restitution damages and losses from LSF9, acting directly and indirectly through Caliber and SPS, since LSF9

45

before they began to act on its behalf, Caliber and SPS chose to evade the path described above to improperly circumvent Maryland law and improperly lend their licenses to LSF9. At all times relevant and material to this action, with knowledge that LSF9 failed to obtain the required license to act as collection agencies, Caliber and SPS attempted to collect or actually collect on its behalf from the Named Plaintiffs and SPS Class, Caliber Class, and Inspection Fee class members.

134. The Named Plaintiff and members of the SPS Class, Caliber Class, and Inspection Fee classes were not required to assume that LSF9 were engaging in illegal activities with the aid and assistance of SPS and Caliber. The Named Plaintiffs and members of the SPS Class, Caliber Class, and Inspection Fee classes were reasonable in not assuming that Caliber or SPS were aiding LSF9's illegal activities.

135. Any limitations period that may otherwise apply to claims of the Named Plaintiffs and members of the SPS Class, Caliber Class, and Inspection Fee class members is tolled by the Altenburg Action in the Federal Court and also since LSF9, Caliber, and SPS had duties to disclose material facts to the Named Plaintiffs and SPS Class, Caliber Class, and Inspection Fee class members related to LSF9's illegal status. The omission of this fact made LSF9's, Caliber's, and SPS' acts unfair or deceptive.

136. Due to their presumed and actual knowledge, as described *supra*, LSF9, Caliber, and SPS had an appreciation that they were not entitled to receive the benefits they were attempting to collect or actually collecting from the Named Plaintiffs and SPS Class, Caliber Class, and Inspection Fee class members.

137. Named Plaintiffs and the Caliber Class and SPS class members are entitled to restitution damages and losses from LSF9, acting directly and indirectly through Caliber and SPS, since LSF9

45

is not permitted to profit off its illegal activities in Maryland. To suggest otherwise would permit LSF9 to retain profits from its illegal activity.

138. Named Plaintiff Ms. Martinson and the Inspection Fee Class members are entitled to statutory damages pursuant to COM. LAW § 12-121(a)(1)(ii) for each inspection fee assessed to their mortgage accounts by LSF9 through a capitalization of property inspection fees into LSF9's standard modification/forbearance agreement.

**COUNT I**
**DECLARATORY RELIEF**
**(Against All Defendants)**

139. Named Plaintiffs incorporate all preceding paragraphs as if set forth fully herein.

140. Named Plaintiffs and the Class Members are entitled to declaratory relief pursuant MD. RULE 2-231 and CTS. & JUD PROC. § 3-409.

141. Named Plaintiffs seek a declaration that: (a) LSF9 is not entitled, directly or indirectly, as a matter of law to collect against any member of the Class while acting as an unlicensed collection agency; (b) Named Plaintiffs also seek a declaration that Caliber and SPS may not, directly or indirectly threaten or actually utilize the assistance of any Maryland court to collect or attempt to collect any consumer debt owed to LSF9 while it is acting as an unlicensed collection agency; and (c) LSF9, Caliber, and SPS must disgorge all profits received from Caliber and SPS Class members including interest, property preservation fees, foreclosure costs, and other fees.

WHEREFORE, Named Plaintiffs pray that this Court to enter declaratory judgments in their favor and make the following Orders to:

      a. Certify this case as a class action pursuant to MD. RULE 2-231 with the Named Plaintiffs as the Class Representatives and their attorneys as counsel on behalf of the Class described herein;

b. Order and declare that as a matter of law, that LSF9, Caliber, SPS, and any person acting on LSF9's behalf, including its authorized agents and attorneys, may not collect directly or indirectly from Named Plaintiffs and the Class members' alleged debts;

c. Order and declare that LSF9, Caliber, and SPS are required to disgorge all profits received from the SPS Class, Caliber Class, and Inspection Fee Class members;

d. Order and declare that the Defendants are not entitled to the assistance of any Maryland Court to collect any alleged consumer debt of Named Plaintiffs or the Class members;

e. Order and declare that LSF9 is not entitled to the assistance of any Maryland Court to collect any alleged consumer debt of Named Plaintiffs or the Class members;

f. Award reasonable attorneys' fees, litigation expenses and costs;

g. Order other appropriate declaratory relief; and

h. Provide such other or further relief as the Court deems appropriate.

**COUNT II**
**COMMON LAW CLAIM ON BEHALF OF THE CALIBER CLASS**
**FOR UNJUST ENRICHMENT**
**(By All Named Plaintiffs on Their Behalf Individually and On Behalf of the Caliber Class Against LSF9 and Caliber)**

142. Named Plaintiffs incorporate all preceding paragraphs as if set forth fully herein. Named Plaintiffs pursue this action on behalf of the Caliber Class members and themselves individually.

143. Defendant LSF9 was not entitled to receive, directly or indirectly, any benefit (including profits) or payments directly traceable to its profits realized from the Named Plaintiffs and Caliber Class member's payments which were applied by Caliber to interest, fees, and costs unrelated to

the principal portion of the payments. An unlicensed collection agency is not permitted to profit from its illegal activities.

144.     Maryland law recognizes that a claim for unjust enrichment is permitted in instances like this one where even though a claim may be covered by a contract between the parties where (i) one party breaches the contract (by charging sums now lawfully charged), (ii) the contract does not fully address a subject matter such as one party's illegal, criminal activity and (ii) there is evidence of fraud or bad faith when a party acts contrary to the law. *Cty. Comm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 100 (2000).

145.     As demonstrated herein, LSF9 and Caliber have known their practices are illegal but have knowingly assumed the risk of continuing to collect without the right to so while concealing from Named Plaintiff and the Caliber Class members the true facts that LSF9 is acting illegally through Caliber.

146.     LSF9 and Caliber have known or should have known since 2007 that LSF9 was required to have a license to act as a collection agency in the State of Maryland and LSF9 failed to obtain a license to act as collection agency before attempting and actually collecting from Named Plaintiffs and the Caliber Class members. LSF9 and Caliber have known since multiple Maryland state courts (*see* Exhibits 1-3) ruled LSF9 had no right to collect against the Named Plaintiffs and Caliber Class members but they have continued to do so in disregard to those court orders and have knowingly continued to collect and attempt to collect from them under the color of law without the right to do so.

147.     Due to its knowledge, as described above, Caliber and LSF9 had an appreciation that neither was entitled to receive the benefits it was collecting from Named Plaintiffs and Caliber Class members that flow from the payments collected and misdirected by Caliber to permit LSF9

to profit from its illegal activities in the form of interest, costs, and fees realized from named Plaintiff's and the Caliber Class members' payments (other than what was applied to the principal portion of their monthly payments).

148.    The acceptance and retention by Caliber and LSF9 of any sums received as claimed interest, fees, and costs unrelated to the principal portion of their payments of Named Plaintiffs and Caliber Class members under such circumstances is inequitable since Caliber and LSF9 did not have the legal right to even collect such payments in the first instance in the manner it sought to collect them—this conclusion is just and proper even though LSF9 and Caliber might have otherwise collected the alleged debts legally by obtaining a license. The amounts accepted and retained by LSF9 and Caliber for interest, fees, and costs unrelated to the principal portion due from Named Plaintiffs and the Caliber Class members on their mortgage loans are liquidated amounts.

WHEREFORE, Named Plaintiffs and the Caliber Class Members pray that this Court:

a.    Certify this case as a class action with Named Plaintiffs as the class representatives for the Caliber Class members and their attorneys as counsel on behalf of the Caliber Class members described herein;

b.    Grant a money judgment in favor of the Named Plaintiffs against Caliber and LSF9 and order the Defendants to disgorge and pay to the Named Plaintiffs and Caliber Class members a sum equal to all interest, fees, and costs unrelated to the principal portion due from them that Caliber and LSF9 have collected, and the benefits and profits they realized, aggregated to a total sum for all Caliber Class members in excess of $75,000.00.

c.    Award reasonable attorney's fees, litigation expenses and costs; and

d.    Provide such other or further relief as the Court deems appropriate.

## COUNT III
## COMMON LAW CLAIM ON BEHALF OF THE SPS CLASS
## FOR UNJUST ENRICHMENT
### (By Named Plaintiffs Mr. & Mrs. Suazo, on behalf of the SPS Class Against SPS and LSF9)

149.    Named Plaintiffs Mr. & Mrs. Suazo incorporate all preceding paragraphs as if set forth fully herein. Mr. & Mrs. Suazo pursue this action on behalf of the SPS Class members and themselves individually.

150.    Defendant LSF9 was not entitled to receive, directly or indirectly, any benefit (including profits) or payments directly traceable to its profits realized from the Named Plaintiffs Mr. & Mrs. Suazo and SPS Class member's payments which were applied by SPS to interest, fees, and costs unrelated to the principal portion of the payments. An unlicensed collection agency is not permitted to profit from its illegal activities.

151.    Maryland law recognizes that a claim for unjust enrichment is permitted in instances like this one where even though a claim may be covered by a contract between the parties where (i) one party breaches the contract (by charging sums now lawfully charged), (ii) the contract does not fully address a subject matter such as one party's illegal, criminal activity and (ii) there is evidence of fraud or bad faith when a party acts contrary to the law. *Cty. Comm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 100 (2000).

152.    As demonstrated herein, LSF9 and SPS have known their practices are illegal but have knowingly assumed the risk of continuing to collect without the right to so while concealing from Named Plaintiffs Mr. & Mrs. Suazo and the SPS Class members the true facts that LSF9 is acting illegally through SPS.

50

153.     LSF9 and SPS have known or should have known since 2007 that LSF9 was required to have a license to act as a collection agency in the State of Maryland and LSF9 failed to obtain a license to act as collection agency before attempting and actually collecting from Named Plaintiffs Mr. & Mrs. Suazo and the SPS Class members. LSF9 and SPS have known since multiple Maryland state courts (*see* Exhibits 1-3) ruled LSF9 had no right to collect against the Named Plaintiffs and SPS Class members but they have continued to do so in disregard to those court orders and have knowingly continued to collect and attempt to collect from them under the color of law without the right to do so.

154.     Due to its knowledge, as described above, SPS and LSF9 had an appreciation that neither was entitled to receive the benefits it was collecting from Named Plaintiffs and SPS Class members that flow from the payments collected and misdirected by SPS to permit LSF9 to profit from its illegal activities in the form of interest, costs, and fees realized from named Plaintiff's and the SPS Class members' payments (other than what was applied to the principal portion of their monthly payments).

155.     The acceptance and retention by SPS and LSF9 of any sums received as claimed interest, fees, and costs unrelated to the principal portion of their payments of Named Plaintiffs and SPS Class members under such circumstances is inequitable since SPS and LSF9 did not have the legal right to even collect such payments in the first instance in the manner it sought to collect them—this conclusion is just and proper even though LSF9 and SPS might have otherwise collected the alleged debts legally by obtaining a license. The amounts accepted and retained by LSF9 and SPS for interest, fees, and costs unrelated to the principal portion due from Named Plaintiffs and the SPS Class members on their mortgage loans are liquidated amounts.

WHEREFORE, Named Plaintiffs and the SPS Class Members pray that this Court:

a.        Certify this case as a class action with Named Plaintiffs as the class representatives for the SPS Class members and their attorneys as counsel on behalf of the SPS Class members described herein;

b.        Grant a money judgment in favor of the Named Plaintiffs against SPS and LSF9 and order the Defendants to disgorge and pay to the Named Plaintiffs and SPS Class members a sum equal to all interest, fees, and costs unrelated to the principal portion due from them that SPS and LSF9 have collected, and the benefits and profits they realized, aggregated to a total sum for all SPS Class members in excess of $75,000.00.

c.        Award reasonable attorney's fees, litigation expenses and costs; and

d.        Provide such other or further relief as the Court deems appropriate.

## COUNT IV
### (Individual and Class Claim pursuant to COM. LAW § 12-121(a)(1)(ii) on behalf of the Inspection Fee Class Members and Named Plaintiff Ms. Martinson Individually and on Behalf of the Inspection Class Against LSF9)

156.    Named Plaintiff Ms. Martinson incorporates all preceding paragraphs as if set forth fully herein. This claim for state statutory damages pursuant to COM. LAW § 12-121(a)(1)(ii) is brought by Ms. Martinson on behalf of herself individually and on behalf of the Inspection Fee Class against the Defendant LSF9.

157.    The OCFR has determined, under its authority as Maryland's regulator implementing Maryland mortgage lender laws, that assignees of mortgage lenders may not violate COM. LAW § 12-121(b).

158.     As the owner and assignee of Ms. Martinson and the Inspection Fee Class members' loans, LSF9 stands in the shoes of its assignor(s) (or their predecessors) who made the loans to Ms. Martinson and the Inspection Fee Class members and has no greater rights as the assignee than the assignors (including those who made the loans).  LSF9 is therefore the maker of Ms. Martinson's and the Inspection Fee Class members' by accepting the assignment of the loans and related deeds of trust.

159.     If the General Assembly had intended to exclude mortgage assignees like LSF9 from liability pursuant to COM. LAW § 12-121(b), it knew how to do so but did not.  *Compare* COM. LAW § 12-1026(b)(5)(i)(1); *Blackstone v. Sharma*, 161 A.3d 718, 727, cert. granted, , 170 A.3d 290 (2017)(recognizing that an entity not "explicitly exempt[ed]" from a statutory scheme demonstrated that "the General Assembly expressed a clear intent to subject [the entity]" to the statutory scheme).

160.     COM. LAW § 12-121(b) prohibits a lender from imposing property inspection fees on Ms. Martinson and the Inspection Fee class members after the origination of the subject loans.  COM. LAW § 12-121(b) does not exempt LSF9 from its express prohibition.

161.     LSF9 was entitled to require any charge to the mortgage loan accounts of Ms. Martinson and the Inspection Fee class members related to property inspections to be capitalized into its standard loan modification/forbearance agreement since the fees were unrelated to the construction to a new home or repairs, alterations, or other work required by any lender.

162.     At all times relevant and material to this action in the three years before the commencement of this action, LSF9 has known or should have known that it were not permitted to require the imposition of unauthorized inspection fees to the mortgage accounts of Ms. Martinson and the Inspection Fee Class members since all persons are expected to know the law.

53

163.   COM. LAW § 12-114(a)(1)(ii) provides that LSF9 shall forfeit to borrowers like Ms. Martinson and the Inspection Fee Class members the sum of $500 for any violation of the subtitle including COM. LAW § 12-121(b).

164.   Ms. Martinson and the Inspection Fee Class members are entitled to the sum of $500 for each inspection fee capitalized into LSF9's standard loan modification/forbearance agreement and imposed against the mortgage loan accounts of Ms. Martinson and the Inspection Fee Class members pursuant to COM. LAW § 12-121(b).

WHEREFORE, Named Plaintiff Catherine Martinson and Inspection Fee Class members pray that this Court:

a.     Certify this case as a class action with Named Plaintiff Catherine Martinson as class representative and her attorneys as class counsel on behalf of the Inspection Fee Class members described herein;

b.     Grant a money judgment and order Defendant LSF9 to forfeit and pay to the Named Plaintiff Catherine Martinson and the Inspection Fee Class members $500 for each property inspection fee LSF9 has capitalized into its standard modification/forbearance agreements with them related to their mortgage loan accounts, aggregated to a total sum for all Inspection Fee Class members in excess of $75,000.00;

c.     Award prejudgment interest to the Named Plaintiff Catherine Martinson and Inspection Fee Class members on the statutory damages they are entitled to receive;

d.     Award reasonable attorney's fees, litigation expenses and costs to the

54

extent allowed by law; and

e.       Provide such other or further relief as the Court deems appropriate.

Respectfully Submitted,

Phillip R. Robinson
Consumer Law Center LLC
8737 Colesville Road, Suite 308
Silver Spring, MD 20910
Phone (301) 448-1304
*Attorney for Named Plaintiffs*

## Request for Jury Trial

Named Plaintiffs request a jury trial on their individual and putative class claims asserted herein.

Phillip Robinson

2018 APR 12 PM 1: 31

FILED
CLERK OF COURT
CLERK'S OFFICE
MONTGOMERY CO. MD